Leibensperger, Edward P., J.
Plaintiff, Dylan Pene-bre, holds a 20% member interest in a Florida LLC called Shakensoft, LLC. Defendants, Daniel Kurland and Scott Kurland, hold member interests of 57% and 20%, respectively.[1] This case concerns the power and authority of defendants, as majorily owners of the LLC, to effect the termination of the business, or at least a major part of the business, that constitutes the source of plaintiffs’ economic interest. Whether defendants possess the power and authority to terminate the business must be analyzed under the Operating Agreement (“Agreement”) of the LLC, as well as under principles of common-law fiduciary duties. Penebre moves for a preliminary injunction to preserve the status quo ante of the business on the date before defendants took steps to terminate the business.
BACKGROUND
Shakensoft sells a point-of-sale software product designed for bars and restaurants. The product, Point-OS, allows customers to process multiple orders from waiters at multiple terminals, as well as to perform other services and reports for the customer. Shakensoft has a Boston office from which nine (9) salespersons operate to sell PointOS. Penebre is the Executive Vice President of the LLC. His duties, as described in the Agreement, are “(o]versees operations, sales, marketing, company strategy and personnel.” Penebre’s compensation is based entirely upon commissions earned. He receives a percentage of “Net Sales” (a defined term) accomplished by him and his sales force in Boston. The other salespersons are also compensated only on a commission basis.
On September 1, 2016, following unsuccessful attempts to resolve disputes between Penebre and defendants, defendants caused a vote of the members of the LLC to be taken. Defendants exercised their combined 77% ownership interest to vote to shut down immediately the Boston office of the LLC. All nine salespersons, including Penebre, were terminated from employment. Defendants proceeded immediately to dismantle telephones, office equipment and computers. They eliminated access by Penebre and the other former salespersons to Shakensoft’s email server and a database, called CRM, necessary to service customers and potential customers. According to Penebre, more than $1 million of potential sales to customers were in the pipeline on that date. Penebre protested the vote as not being in accordance with the Agreement and objected to the immediate termination of the Boston office. Penebre asserts that he and the other salespersons are unable to complete sales and service customers as a result of the termination of their employment and the denial of access, all to the detriment of the goodwill of Shakensoft.
On September 6, 2016, Penebre commenced this action by verified complaint and moved for a preliminary injunction. Service on defendants was accomplished on September 8, 2016. The motion for preliminary injunction was heard on September 13, 2016. Defendants, through counsel, appeared at the hearing. Defendants presented argument against the issuance of a preliminary injunction but filed no affidavits or memorandum.
ANALYSIS
The familiar standards for a preliminary injunction are that the moving party must show (1) a likelihood of success on the merits; (2) that irreparable harm will result from denial of the injunction; and (3) that, in light of the plaintiffs likelihood of success on the merits, the risk of irreparable harm to the plaintiff outweighs the potential harm to the defendant in granting the injunction. Tri-Nel Management, Inc. v. Board of Health of Barnstable, 433 Mass. 217, 219 (2001), citing Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 617 (1980). In applying these standards the court applies a balancing test: “What matters as to each parly is not the raw amount of irreparable harm the parly might conceivably suffer, but rather the risk of such harm in light of the parly’s *622 chance of success on the merits. Only when the balance between these risks cuts in favor of the moving party may a preliminary injunction properly issue.” Id. In an appropriate case, “the risk of harm to the public interest also may be considered.” Brookline v. Goldstein, 388 Mass. 443, 447 (1983).
Likelihood of Success
Penebre contends that the vote to terminate the Boston office was in violation of the Agreement. Thus, the vote is a nullity and the Boston office should be restored.
The Agreement provides that certain actions affecting the LLC are deemed “Major Decisions” and such actions require unanimous written consent of the members or a vote of a “Super-Majoriiy-In-Interest” of the members. Agreement, §4.12. Among the actions described as a “Major Decision” is a decision to “amend, enforce or terminate any agreement with a Member ... or grant approvals or waivers under any such agreement (including setting the salary or changing or [sic] compensation and benefits of any Member or related parties who are employees) . . .” Agreement, §4.12(g). While all the other described “Major Decisions" in subparagraphs (a) through (m) of §4.12 of the Agreement require a Super-Majority-In-Interest vote of 75% of member interests, §4.12(g) is the exception. In order to effect a decision covered by subparagraph (g), the vote of member interests must be 85%.
The reasonable inference from the difference in percentage vote required for effecting a Major Decision directly affecting a member, like Penebre, as opposed to all other Major Decisions is that the higher percentage vote was intended to give a type of veto power to a minority member. From the outset of the LLC, the respective interests in the LLC were held as described above. Daniel Kurland, who is the manager of the LLC and the holder of a 57% interest, has broad authority to conduct the business of the LLC. See §4.1 of the Agreement. But when it comes to Major Decisions, he needs the alignment of at least one of the 20% holders to reach the 75% vote requirement. The 85% vote requirement for a Major Decision under §4.12(g) protects a minority member when, for example, the Kurlands align against another minority member such as Penebre. Thus, from the beginning, the Agreement expresses and guarantees a valuable protection against tyranny by the majority.
The vote by defendants on September 1, 2016, to close the Boston office and terminate the employment of Penebre and the other salespersons was a Major Decision under §4.12(g) of the Agreement. There is no question that the decision terminated an agreement with a member (Penebre and Macomber) that provided his compensation. Moreover, the decision affected the compensation of “related parties who are employees.” §4.12(g). Penebre’s compensation was directly tied to sales made by all of the salespersons who were terminated. Because the vote to terminate the Boston office and fire employees failed to obtain an 85% vote of the members the vote was a nullity. Accordingly, Penebre and Macomber have demonstrated a reasonable likelihood of success on their claims of breach of the Agreement.
In addition, Penebre and Macomber demonstrate a likelihood of success on their claim of breach of fiduciary duly. What the majority members did by their unauthorized, self-help conduct was to deny plaintiffs the fruits of their employment and member interests. This is a classic example of a corporate “freeze out” of a minority shareholder. This is particularly so where the Agreement provides another, express remedy for resolution of a dispute among members regarding the future of the business. Section 6.7 of the Agreement states that if a Super-Majoriiy-In-Interest fails to reach agreement regarding a Major Decision “then an impasse (“Impasse”) shall be deemed to exist.” Upon such Impasse, a member may initiate a buy-sell process that will result in the acquisition of the minority member’s interest or the majority members’ interest by the minority. Defendants violated this section of the Agreement by implementing the disputed Major Decision to close the Boston office without recognizing plaintiffs’ right to invoke the buy-sell process. Moreover, plaintiffs have demonstrated a reasonable likelihood that defendants’ unilateral conduct was a violation of their fiduciary duties.
Irreparable Harm
As described above, the parties provided in the Agreement a mechanism to resolve an Impasse like the one presented here. If defendants want to close the Boston office and terminate all the employees, including Penebre, they must, at minimum, allow plaintiffs to invoke the buy-sell process under §6.7. The process contemplates a ninety (90) day period for the transaction (either a buy or sell) to be completed. Concepts of good faith and fair dealing require that neither side do anything to harm the goodwill and future prospects of the business while the buy-sell process is ongoing. Defendants’ unilateral conduct to close the Boston office has and "will harm the goodwill of Shakensoft in a manner that will be difficult if not impossible to measure in money damages. The inability of the company’s salespersons to service existing customers and to sell products to existing and new customers will affect the reputation of Shakensoft. Such goodwill is recognized as an interest that may be protected by a preliminary injunction. New England Canteen Service, Inc. v. Ashley, 372 Mass. 671, 674 (1977). Finally, given the buy-sell agreement between the parties, failure to enjoin defendants from destroying the company would adversely affect the value of the company and, thus, their membership interests so as to make the buy-sell process illusory.
Balance of Harms
Requiring defendants to restore the Boston office to the status quo ante presents no substantial potential *623 harm. The employee/salespersons are paid based on commissions. As a result, before a payroll expense is incurred, there will be revenue from which to pay the commission. Other expenses of maintaining the office for a period of approximately ninety (90) days have not been detailed to the court. It is only logical, however, to conclude that all parties will benefit from a buy-sell process based upon an a company that is a going concern. Without more detailed information, the court cannot conclude that defendants’ interests outweigh the interest of plaintiffs to maintain their employment and to resolve the Impasse by way of the agreed-upon process. The balance of harms favors plaintiffs.
Security
Rule 65(c) of the Massachusetts Rules of Civil Procedure provides that, “(u]nless the court, for good cause shown, shall otherwise order, no restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.” See Petricca Constr. Co. v. Commonwealth, 37 Mass.App.Ct. 392, 401 (1994) (“[R]ule 65(c) explicitly allows the court discretion as to security”). Here, given the expense that may be incurred by defendants to restore Shakensoft to the status quo ante of the day before September 1, 2016, a reasonable sum should be required to secure payment to defendants for expenses incurred if it turns out that they have b een wrongfully enj oined. The court sets that amount as $5,000, and requires that sum to be paid in to court by plaintiffs before the injunction, as described below, -will become effective.
ORDER OF PRELIMINARY INJUNCTION
For the reasons stated above, defendants are hereby ORDERED and RESTRAINED as follows:
1. To take no action to interfere with or to obstruct the business of the Boston office of Shakensoft, LLC, for a period of ninety (90) days from the date of this Order or whenever the buy-sell process under §6.7 of the Agreement is completed, whichever is longer, or upon further order of the court;
2. To restore the operation of the Boston office of Shakensoft to the condition it was in prior to September 1, 2016, as follows for a period of ninety (90) days:
Return all office phones, equipment and hard drives;
Restore all fired sales employees to their positions;
Restore access by the sales employees to company email, the CRM system and Buyerzone leads;
Maintain the office premises and related occupancy expenses;
Pay commissions in the ordinary course and pursuant to the Agreement.
This Order will become effective upon plaintiffs’ deposit "with the court of $5,000 as security.

 Plaintiff, William Tileston Macomber, holds a 3% member interest.